UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PATRIOTIC VETERANS, INC., Plaintiff, v. STATE OF INDIANA EX REL. GREG ZOELLER, ATTORNEY GENERAL, and GREG ZOELLER, Attorney General, Defendants. | ) | Cause No. 1:10-cv-723-WTL-TAB |

**COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants the State of Indiana and Greg Zoeller, in his official capacity as Attorney General of the State of Indiana, respectfully submit this memorandum in support of their motion for summary judgment and opposing the motion for summary judgment of Plaintiff Patriotic Veterans, Inc. ("PVI").

PVI has filed an Amended Complaint seeking a declaration that Indiana Code § 24-5-14-5 (the "Autodialer Law") is invalid. (*See* Am. Compl. ¶ 1.) Specifically, PVI alleges that the Autodialer law, insofar as it applies to interstate political-campaign calls, violates the First Amendment by suppressing PVI's political speech; is pre-empted by the Federal Communications Act of 1934, 48 Stat. 1062 (1934) ("FCA"), the Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) ("TCPA"), and FCC rules implementing the same; and deprives PVI of rights secured by the Supremacy Clause of the United States Constitution. (*See* Am. Compl. ¶¶ 24-38.) PVI seeks a permanent injunction

preventing the Attorney General from enforcing the Autodialer Law with respect to interstate political-campaign calls. (*See* Am. Compl. ¶ 4.)

There are no material facts in dispute, and plaintiff's claims fail as a matter of law, as discussed below. The Court should enter summary judgment for the Attorney General and deny Plaintiffs' motion for summary judgment.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1. Indiana protects its citizens from unwanted telemarketing calls on two levels. In 1988, the General Assembly enacted the first of these by banning, absent the consent of the call recipient (with a few narrow exceptions), calls that deliver prerecorded messages by way of autodialers. *See* Ind. Code § 24-5-14-5. In 2001, the General Assembly enacted a second level of protection—upheld in *Nat'l Coal. of Prayer v. Carter*, 455 F.3d 783, 790 (7th Cir. 2006)—permitting citizens to register with the Attorney General their preferences not to receive "telephone sales calls." Telemarketers may not, without consent, make such calls—no matter how dialed—to registered residential telephone numbers. *See* Ind. Code § 24-4.7-2-9 (the "Telephone Privacy Act" or "do-not-call" law).

Calls on behalf of political campaigns—whether to solicit donations, to urge voting, deliver a message, or take a survey—are covered by the Autodialer Law but not the Telephone Privacy Act. That is, the Autodialer Law sweeps within its ambit *all* autodialed, prerecorded calls (with narrow exemptions), including political-campaign calls: "A caller may not use or connect to a telephone line an automatic dialing-announcing device . . ." that delivers a prerecorded message. *See* Ind. Code § 24-5-14-5(b). The Telephone Privacy Act, however, applies only to "telephone sales calls," which means only calls peddling "consumer goods and

services" or soliciting "a charitable contribution." Ind. Code §§ 24-4.7-2-9, 24-4.7-4-1. As political-campaign calls do neither, they are outside the ambit of the do-not-call law.

2. The Autodialer Law regulates the use of "automatic dialing-announcing devices[s]," defined as devices that "select[] and dial[] telephone numbers" and then deliver "a pre-recorded or synthesized message" to those numbers. Ind. Code § 24-5-14-1. The operative text of the Autodialer Law prohibits "callers" from making calls using "an automatic dialing-announcing device unless: (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered." Ind. Code § 24-5-14-5(b). A "caller" is "an individual, corporation, limited liability company, partnership, unincorporated association, or any entity that attempts to contact, or contacts, a subscriber in Indiana by using a telephone or telephone line." Ind. Code § 24-5-14-2.

The Autodialer Law has three narrow exceptions to its regulation of disseminating pre-recorded messages by means of an autodialer: (1) "school districts" may send these messages "to students, parents, or employees;" (2) a caller may direct these messages to recipients "with whom the caller has a current business or personal relationship;" and (3) employers may send pre-recorded messages "advising employees of their work schedules." Ind. Code § 24-5-14-5(a).

The Autodialer Law also requires anyone using an automatic dialing-announcing device to ensure that the device "disconnect[s] within ten (10) seconds after termination of the telephone call" by the recipient. Ind. Code § 24-5-14-6. When a caller uses a live operator to introduce its pre-recorded message, this operator must make prescribed disclosures at the beginning of the call, including "(1) the name of the business . . . or entity for which the message is being made; (2) the purpose of the message; (3) the identity or kinds of goods or services that the message is

promoting; and (4) if applicable, the fact that the message intends to solicit payment or the commitment of funds." Ind. Code § 24-5-14-7.

Violations are subject to enforcement actions by the Attorney General. *See* Ind. Code § 24-5-14-13. Available remedies include injunctions against future violations and fines for past violations. *See* Ind. Code §§ 24-5-0.5-4(c), 24-5-0.5-4(g).

3. The effectiveness of state telemarketing laws led telemarketing organizations to file petitions with the Federal Communications Commission ("FCC") in 2004 & 2005 seeking declaratory rulings that the FCC's rules preempted state telemarketing laws affecting interstate calls, including Indiana's do-not-call law. *See* Petition for Declaratory Ruling, *In re Consumer Bankers Association*, FCC CG Docket No. 02-278 (filed November 19, 2004) (seeking declaratory ruling declaring Indiana telemarketing laws preempted by FCC rules); Joint Petition for Declaratory Ruling, *In re Alliance Contact Services*, FCC CG Docket No. 02-278 (filed April 29, 2005) (seeking declaratory ruling stating that FCC has exclusive regulatory jurisdiction over interstate telemarketing). The FCC received thousands of comments from citizens, states, and telemarketers in 2004 and 2005. *See generally* FCC CG Docket No. 02-278. The FCC has taken no action on these petitions. *See generally id.*

4. Indiana is not alone in its concerns about telemarketing calls in general and autodialed phone calls in particular. By 1991, more than 40 separate states had enacted legislation restricting autodialing devices and unsolicited telemarketing. *See* S. Rep. No. 102-178, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1970. Recognizing the concerns motivating these laws, Congress enacted the TCPA to mitigate the deleterious effects of the rapidly growing telemarketing industry on residential privacy. *See* S. Rep. No. 102-177, at 1-2 (describing the large number of consumer complaints about and the rapid growth of the telemarketing industry).

In doing so, Congress noted that less than 0.01% of the population "likes" receiving telemarketing calls, including those which are autodialed. *Id.* at 2. Congress identified autodialers as a special problem due to the dramatic increases in efficiency and decreases in expense the technology afforded telemarketers, combined with the ability of this technology to harass and disrupt the lives of call recipients. *See id.* To address this problem in the face of FCC inaction and congressional concerns about enforcement gaps in state law, Congress enacted the TCPA as a supplement to the forty separate state laws already regulating telemarketing calls. *See id.* at 3. Thus, Congress expressly disclaimed any intention to preempt state laws. *See* 47 U.S.C. § 227(e)(1) ("[N]othing in this section . . . shall preempt any state law . . . which prohibits . . . the use of automatic dialing systems [or] the use of artificial or prerecorded messages.").

5. Indiana is known for its strict protection of residential privacy from telemarketers. When it comes to restricting telephone sales calls, Indiana's Telephone Privacy Act "is one of the best in the country because it has so few exemptions." Maureen Groppe, *National no-call list may be lax*, The Indianapolis Star, Feb. 28, 2003 (Ex. 1) (citing views of Bob Bulmash of Private Citizen). Though this case concerns the Autodialer Law rather than the Telephone Privacy Act, the efficacy of the Telephone Privacy Act is relevant for purposes of understanding the State's regulatory interest when it comes to enforcing the Autodialer Law.

Scientific survey evidence confirms the efficacy of the Telephone Privacy Act. Shortly after the Telephone Privacy Act became enforceable in 2002, Dr. Tom W. Smith, the Director of the General Social Survey Program at the National Opinion Research Center and a leading international expert on the design and conduct of surveys, collaborated with Walker Information to design and conduct a survey to determine the impact of the Telephone Privacy Act on the level of telemarketing calls in Indiana. (Tom W. Smith Decl., Ex. 2, ¶¶ 12-13.) The survey

showed that for people on the do-not-call list, calls on average declined from 12.1 per week (demonstrating the existence of the original telemarketing problem) to 1.9 per week post-enforcement, a decline of over 80%. (*Id.* at ¶ 14.) By way of comparison, non-registered households continued to receive 7.7 calls per week post-enforcement. (*Id.*) This led Dr. Smith to conclude that the Telephone Privacy Act "led to a huge decline in telemarketing calls, remains highly successful, and is extremely effective. (*Id.* at ¶ 27.)

The most recent population and telephone subscribership data from which the state can estimate the number of residential phone lines in Indiana dates from July 1, 2008. (Marguerite M. Sweeney Decl., Ex. 3, ¶ 11.) At that time, the do-not-call list contained 1,957,697 numbers. (*Id.* at ¶ 12.) This represented approximately 75.5% of Indiana households. (*Id.*) The current list contains 1,828,065 numbers, but Indiana does not currently have accurate population data with which to estimate residential telephone subscribership and thus the percentage of households represented for 2010. (*Id.* at ¶¶ 10-11.) However, only 341 registered subscribers have requested that they be removed from the list since 2002. (Ex. 2, ¶ 24.)

Since 2002, the Attorney General has fielded 27,577 valid[1] complaints under the Telephone Privacy Act and Autodialer Law. (Ex. 3, ¶ 18.) Of these, 4,668 have been settled via an Assurance of Voluntary Compliance, 21,488 have been resolved by other means, and investigations are ongoing in 1,401. (*Id.* at ¶ 21.) Of the 8,799 valid complaints received since January 1, 2009, 4,553, or 51.7%, have reported the use of autodialers. (*Id.* at ¶ 19).

6. PVI is a § 501(c)(4) not-for-profit Illinois corporation. (Pl. Ex. D, ¶ 2.) Using a recording of its spokesperson's voice, it disseminates unsolicited political messages throughout the nation in jurisdictions that do not ban such activity. (Pl. Ex. E, ¶ 7.) PVI implies that it has

---

[1] A "valid" complaint "alleges facts that describe a possible violation of the Telephone Solicitation of Consumers Act or the Regulation of Automatic Dialing Machines Act, or both, and contains sufficient information to conduct an investigation." (Ex. C, ¶ 17.)

never made its calls in Indiana, (Am. Compl. ¶ 23), but the Attorney General has received at least one complaint alleging otherwise. (Ex. 3, Attach. G.) No enforcement action has been taken due to this complaint. (Ex. 3, ¶ 38.) Other corporations have made similar calls in Indiana using the technology PVI claims renders the Autodialer Law obsolete. (*See* Ex. 3, Attach. D.)

PVI has historically hired Metrotec Advanced Telephone Messaging Services ("Metrotec"), a Voice Messaging Service bureau, to facilitate the spread of its messages. (Pl. Ex. E, ¶ 7.) Using Metrotec, PVI is capable of delivering as many as 100,000 messages in a three hour period. (Pl. Ex. E, ¶ 8.) Metrotec's promotional materials and website explicitly proclaim the unique ability of telephone calls to "stop people and demand[] attention." (Ex. 3, Attachs. E, F). Metrotec also acknowledges that "[f]rankly, some may find automated calls a bit annoying." (Ex. 3, Attachs. E, F). Metrotec's website contains samples of the sorts of calls Metrotec uses to spread its clients' messages. (Ex. 3, Attach. D). None of these calls comply with the disclosure or consent requirements of the Autodialer Law. (Ex. 3, ¶ 30).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986); *Certain Underwriters of Lloyd's v. General Accident Ins. Co. of America*, 909 F.2d 228, 231 (7th Cir. 1990). Under this standard, a dispute of fact that is relevant to the moving party's legal position will defeat summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

# ARGUMENT

## I. Indiana May, Consistent With the First Amendment, Apply its Autodialer Law to Automated Political Calls

Courts around the country have rejected PVI's First Amendment theories in a variety of contexts. The Eighth and Ninth Circuits long ago rejected First Amendment challenges to autodialer laws. *See Bland v. Fessler*, 88 F.3d 729, 732-36 (9th Cir. 1996); *Van Bergen v. Minnesota*, 59 F.3d 1541, 1549-56 (8th Cir. 1995); *Moser v. FCC*, 46 F.3d 970, 973-75 (9th Cir. 1995). *Van Bergen* rejected a challenge by a political speaker. *See Van Bergen*, 59 F.3d at 1546. Other courts, including the Seventh Circuit, have reached similar conclusions with respect to other prohibitions against harassing telephone calls. *See Nat'l Coal. of Prayer v. Carter*, 455 F.3d 783, 792 (7th Cir. 2006); *Fraternal Order of Police v. Stenehjem*, 431 F.3d 591, 600 (8th Cir. 2005); *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 351 (4th Cir. 2005); *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1246 (10th Cir. 2004); *see also Humphrey v. Casino Mktg. Group, Inc.*, 491 N.W.2d 882, 891-92 (Minn. 1992). As private homes are not public fora, callers have no right to impose any sort of message on residents without consent. *See Nat'l Coal.*, 455 F.3d at 790; *Bland*, 88 F.3d at 735; *Van Bergen*, 59 F.3d at 1551-53.

### A. Strict scrutiny does not apply where, as here, a law is content neutral and does not regulate a public forum

PVI's principal argument is that the Autodialer Law should be subjected to, and cannot withstand, strict First Amendment scrutiny. (*See* Pl. Mem 9.) However, there is no doctrine, and PVI has cited no cases, holding that a generally applicable, content-neutral, time, place and manner regulation is subject to strict scrutiny when applied to political speech.

The general rule is that content-neutral laws regulating the time, place, and manner of speech are not subject to strict scrutiny. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S.

41, 47 (1986). Instead, they are valid as long as they have a reasonable fit with an important government interest. *See id.* at 50. A law that regulates speech is content neutral as long as it is *justified* by reference to something other than the content of the speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

The Autodialer Law fits this model. It prohibits, with a handful of justifiable exceptions, all prerecorded telephone calls made with an autodialer without the consent of the call recipient. *See* Ind. Code § 24-5-14-5. It does so without regard to the content of the message and for the purpose of defending the residential privacy of Indiana residents from unsolicited, harassing phone calls. Every appellate court that has reviewed similar autodialer laws has concluded that they are content neutral, *see Bland*, 88 F.3d at 733-34; *Moser*, 46 F.3d at 973, even as applied to calls made in connection with a political campaign, *see Van Bergen*, 59 F.3d at 1550-51.

PVI's strict scrutiny theory relies on cases where the statutes at issue *targeted* political speech. (Pl. Mem. 10.) In *Meyer v. Grant*, 486 U.S. 414, 428 (1988), the Court invalidated a prohibition against paying ballot-access-petition circulators. And in *Buckley v. Amer. Const. Law Found., Inc.*, 525 U.S. 182, 200 (1992), the Court struck down a rule requiring election-petition circulators to disclose their names. The laws at issue in those cases applied to nothing but political speech and attempted to blunt the persuasive effect of that speech. The Court could not plausibly have deemed them to be content neutral.

The Autodialer Law in no way *targets* political calls, surveys, solicitations, or any other non-commercial calls. Nor can the Law's narrow exceptions reasonably be said to "exalt" other forms of speech over political speech. (Pl. Mem. 10.) The Autodialer Law applies

evenhandedly whether the calls sell products, ideas, or candidates. It is justified by a concern for the protection of residential privacy, not a concern that any particular message may, for better or worse, influence the views of the call recipient. *Contrast Eu v. San Francisco Cnty. Dem. Cent. Comm.*, 489 U.S. 214, 228-29 (1989); *Meyer*, 486 U.S. at 425-26.

It is thus irrelevant for purposes of evaluating the Indiana Autodialer Law that "core political speech" implicates First Amendment protection "at its zenith." *Meyer*, 486 U.S. at 422, 425. The Supreme Court has long applied ordinary time, place, and manner doctrine, rather than strict scrutiny, to content-neutral laws impacting political communications. In *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803-05 (1984), the Court ruled, without invoking strict scrutiny, that a law prohibiting signs on public property in order to preserve aesthetics could be applied to political-campaign signs. It said that "[t]he incidental restriction on expression which results from the City's attempt to accomplish such a purpose is considered justified as a reasonable regulation of the time, place, or manner of expression if it is narrowly tailored to serve that interest." *Id.* at 808; *see also Frisby v. Schultz*, 487 U.S. 474, 484-85 (1988) (anti-residential picketing law could be directed at abortion protesters); *United States v. O'Brien*, 391 U.S. 367, 382 (1968) (law against destroying draft cards could be applied to burning them as part of a political protest); *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 648-49 (1981) (equating religious messages with political messages and saying content-neutral place-of-speech laws need not accommodate either).

Furthermore, it is implausible that the ordinance requiring rock bands to use house sound mixers upheld in *Ward*, 491 U.S. at 803, or the law prohibiting raucous sound trucks upheld in *Kovacs v. Cooper*, 336 U.S. 77, 87-89 (1949), would have been subjected to strict scrutiny if the speakers had been communicating political-campaign messages, especially since the message in

*Kovacs* concerned a labor dispute. *Id.* at 79. Thus, while states may exempt political solicitations from laws regulating other types of fully protected speech in reliance on its special status, *see Nat'l Coal.*, 455 F.3d at 788-89; *Auburn Police Union v. Carpenter*, 8 F.3d 886, 901 (1st Cir. 1993), a refusal to afford such accommodation does not trigger strict scrutiny.

PVI also claims a justification for strict scrutiny in dicta found in the Seventh Circuit's opinion in *National Coalition*. (Pl. Mem. 14.) PVI argues that "the Indiana Attorney General has ignored the 'implicit exception for political speech' that he recognized in *National Coalition*," but for which PVI alleges the court would have struck down the Telephone Privacy Act. (Pl. Mem. 14.) This argument fails for two reasons.

First, the *Attorney General* created no exceptions from the Telephone Privacy Act. Rather, the Telephone Privacy Act by its own terms applies only to "Telephone Sales Calls," Ind. Code § 24-4.7-4-1, defined as follows:

> [A] telephone sales calls made to a consumer for any of the following purposes:
> (1) Solicitation of a sale of consumer goods or services.
> (2) Solicitation of a charitable contribution.
> (3) Obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes.
>
> The term includes a call made by use of automated dialing or recorded message devices.

Ind. Code § 24-4.7-2-9. Political calls clearly do not fit this definition; thus, the Indiana Telephone Privacy Act does not apply to political calls. The Attorney General had no authority to fashion an exemption for political calls in the Telephone Privacy Act, and has no authority to do so here. Only the General Assembly has the power to create exemptions in statutes.

Second, the Seventh Circuit in no way suggested that strict scrutiny would have applied to the Telephone Privacy Act if it had regulated political calls. Rather, that court noted that the heightened protection granted to political speech allowed the legislature to exempt political calls

from the Telephone Privacy Act without making the Act underinclusive. *See Nat'l Coal.*, 455 F.3d at 791-92 (discussing the propriety of exemptions from the Telephone Privacy Act).[2]

Thus, because the Autodialer Law is a content-neutral law regulating the time, place, and manner of speech, it is not subject to strict scrutiny.

### B. The Indiana Autodialer Law advances the compelling government interest in protecting residential privacy

Government has a well-established compelling interest in protecting residential privacy from harassing telephone calls. *See, e.g., Nat'l Coalition*, 455 F.3d at 790; *Fraternal Order of Police*, 431 F.3d at 597; *Mainstream Mktg.*, 358 F.3d at 1237-38; *Bland*, 88 F.3d at 734-35; *Van Bergen*, 59 F.3d at 1554; *Moser*, 46 F.3d at 974. The Autodialer Law serves this interest by precluding telemarketers such as PVI from using their technology to harass Indiana citizens. PVI admits that, using its vendor Metrotec, PVI can dial 100,000 homes every three hours. (Pl. Mem. 22; Pl. Ex. E, ¶ 8.) Thus, but for the Autodialer Law, PVI could, between 9 a.m. and 9 p.m. when it makes these calls, harass 400,000 Indiana residents per day. Even if PVI will call only once per day, (Pl. Ex. D, ¶ 8), 400,000 unsolicited calls every day is a grave threat to the privacy of Indiana residents' homes.

Nonetheless, PVI asserts that 20-30% of its call recipients in *other* states listen to the entirety of PVI's message, (Pl. Mem. 5), a statistic it contends somehow constitutes evidence that *Indiana* residents would actually welcome PVI's daily, autodialed, prerecorded messages. (Pl. Mem. 19). It also argues that the exceptions to the Autodialer law negate its efficacy. However, contrary to PVI's claims, it is clear that Indiana residents in particular do not welcome

[2] Indeed, the only mention of political speech in the Seventh Circuit's discussion of the proper level of scrutiny to apply to the Telephone Privacy Act was the court's notation in a footnote at the end of the discussion that an act barring only one side of the political debate would be unacceptable. *See Nat'l Coal.*, 455 F.3d at 490 n.3 ("We acknowledge that an act that severely impinged on core First Amendment values, such as an opt-in list that allowed homeowners to block calls from only one side of a political debate, might not survive a *Rowan* balancing test. That is not the case before us, however . . . ."). Of course, the Autodialer Law prevents prerecorded harassment without reference to which side of the political debate is speaking.

prerecorded, autodialed calls. (*See* Ex. 3, ¶ 15.) It is also clear that the narrow exemptions from the Autodialer Law do not impede its effectiveness. There is thus no negating Indiana's interest in protecting residential privacy from telephone harassment nor any reasonable dispute that the Autodialer Law directly advances that objective.

1. First, no rule requires the government to prove the existence of a self-evident problem it seeks to remedy. *See Van Bergen*, 59 F.3d at 1554 ("[W]e do not believe that external evidence of the disruption ADAD calls can cause in a residence is necessary: It is evident to anyone who has received such unsolicited calls when busy with other activities."); *cf. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 953 (7th Cir.), *aff'd* 553 U.S. 181 (2008) (no need to prove existence of in-person voter fraud to justify voter ID law); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 393-94 (2000) (no need to prove danger of political corruption); *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986) (no evidence of vote fraud or political corruption necessary). Consequently, PVI cannot prevail in this case by way of trying to disprove the government's long-recognized compelling interesting in protecting residential privacy from harassing telephone calls.

2. Regardless, the harassing quality of robocalls is easily proved. PVI's robocall vendor, Metrotec, candidly summarizes in its promotional materials the problem that robocalls pose: "The Most Powerful Sound In The World: A ringing telephone—it stops people and demands attention." (Ex. 3, Attach. F.) This incessant "stop and demand" nature of multiple robocalls directed at Hoosier households evening after evening is the evil the General Assembly seeks to stop. Indiana residents do not want to be subjected to onslaughts of telephonic "stop and demand" orders, regardless of their content.

Autodialed calls are "more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." Senate Rep. No. 102-178, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972. Because such calls cannot interact with receivers except in preprogrammed ways, they "do not allow the caller to feel the frustration of the called party," fill up answering machines, and do not automatically disconnect even after hung up on. *See id.* For all of these reasons, Congress explicitly determined that "it is legitimate and consistent with the constitution to impose greater restrictions on automated calls than on calls placed by 'live' persons." *See id.*

Even Metrotec, whose business depends on this disruption of residential privacy, allows that "Frankly, some may find automated calls a bit annoying." (Ex. 3, Attachs. E, F.) If even Metrotec is willing to acknowledge that much, it is no surprise that courts have long recognized the intrusiveness of automated calls. Thus, the Eighth Circuit has noted that such calls are "uniquely intrusive," as "[a]n ADAD does not offer the recipient the option of cutting off the calls; it does not offer householders a choice of whether to respond to the speaker or not." *Van Bergen*, 59 F.3d at 1554-55. The Ninth Circuit has expressed frustration at the "one-way onslaught of information," which makes the disruption autodialers cause "of a different order of magnitude" comparative to door-to-door solicitation. *Bland*, 88 F.3d at 733. Likewise, the Supreme Court of Minnesota expressed concern that the "shrill and imperious ring of the telephone" summons the recipient, depriving them of the ability to choose to expose themselves to particular expression or not. *Humphrey*, 491 N.W.2d at 898-99. These decisions and others like them make manifest the loathing with which prerecorded, autodialed calls are viewed by the residents that receive them.

PVI nonetheless argues that Hoosiers would welcome its autodialed, pre-recorded messages, but its only supporting evidence—that a mere 30 percent of its call recipients in other

states do not immediately hang up—does not demonstrate that *anyone* welcomes the calls. (Pl. Ex. E, ¶ 10.) Those who listen to the entirety of an autodialed, prerecorded message might do so in the hope of learning who has made the call so that they can register their objection to the call. Others may listen in hopes of being able to register for an internal no-call list mandated by federal law. *See* 47 C.F.R. § 64.1200(d). And still others may listen but seethe at the disruption.

Tellingly, the Attorney General has received at least one complaint regarding PVI's prohibited autodialer calls. (Ex. 3, ¶¶ 34-38.) Considering that PVI implies that it has not made any calls to Indiana, (Am. Compl. ¶ 23), this directly disproves any claim that PVI's prerecorded, autodialed messages are welcome. This is not surprising. The Autodialer Law has, since 1988, protected residential privacy by prohibiting non-consensual autodialed, pre-recorded messages. Residential privacy protection was enhanced by the Telephone Privacy Act, which in 2002 created a do-not-call list banning unwanted telephone sales calls, even by live operators. This had a dramatic impact on Hoosiers' residential telephone privacy, leading to an immediate 80% decrease in the number of telemarketing calls that registered telephone subscribers received. (Ex. 2, ¶ 15.) As of October 2010, Indiana's no-call registry contained 1,828,065 unique telephone numbers, and only 341 people have requested removal since 2002. (*Id.* at ¶ 24.) Indiana's citizens have thus placed a premium on *effectively* protecting residential tranquility by prohibiting unwanted telemarketing calls of all types for nearly a decade.

The overwhelmingly positive impact of the Telephone Privacy Act has had ramifications for the Autodialer Law. As a consequence of the efficacy of the Telephone Privacy Act, Hoosiers have grown less tolerant of telemarketing calls of all types, including those not covered by the Telephone Privacy Act, such as calls from political campaigns. Accordingly, as the Indiana air cleared of telephone sales calls earlier this decade, political campaign calls became

more and more noticeable. In the last two years alone, of 8,799 valid complaints about unwanted telemarketing, 51.7% have come from autodialed calls, emphasizing Hoosier unwillingness to accept such intrusions. (*See* Ex. 3, ¶ 19).

This general history of autodialer complaints demonstrates that Hoosiers do *not* welcome autodialer calls, political or not. Indeed, the entire reason PVI has instituted this lawsuit is that it knows that if it makes its supposedly welcome calls it risks prompting residents' complaints and an AG enforcement action. (Am. Compl. ¶¶ 10, 23.) Accordingly, there can be no reasonable dispute that Indiana has a compelling interest in protecting the residential privacy of its citizens from harassing telephone calls.

3. PVI suggests that the limited exemptions for schools, employers, and prior business relationships undermine the Autodialer Law's ability to advance the state's compelling interest in residential privacy. (Pl. Mem. 10-11.) First, it bears observing that "[t]he concept of underinclusiveness needs to be approached with some caution . . . . Holding an underinclusive classification to violate the First Amendment can chase government into overbroad restraints on speech." *Nat'l Fed'n of the Blind*, 420 F.3d at 345 (upholding FTC regulations of charitable solicitations notwithstanding exemptions). It is thus odd for PVI to argue that the Autodialer Law is invalid because it does not restrict *enough* speech.

Second, as the First Amendment prefers more limited speech restrictions, a content-neutral law is fatally *under*inclusive only where its exemptions render the law so ineffectual that its purported justification comes into question. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-30 (1993). Under this standard, the Seventh Circuit invalidated a do-not-call registry covering only one industry because it could not reasonably advance the asserted interest of protecting residential privacy. *See Pearson v. Edgar*, 153 F.3d 397, 404-05 (7th Cir.

1998). However, it has upheld a broad-based do-not-call registry despite a few exemptions because that law *did* reasonably achieve the same objective. *See Nat'l Coal.*, 455 F.3d at 791-92.

In this case, the few exemptions to the Autodialer Law hardly undermine its efficacy or cast doubt upon its speech-neutral justification. The exemptions for calls from schools to their students and employees regarding school schedules, and for all employers who call employees concerning work schedules merely accommodate calls that are not likely to be made repeatedly or in ways that otherwise harass the recipients. And the exemption for calls from those having a prior relationship with the call recipient is a standard and acceptable accommodation in the world of telemarketing regulation. *See Fraternal Order of Police*, 431 F.3d at 596 n.2 (observing that North Dakota's do-not-call registry law includes such an exception); *Mainstream Mktg.*, 358 F.3d at 1236 (observing that the federal do-not-call registry rules include such an exemption). This accommodates such legitimate calls as efforts to collect debts—an exception that the Telephone Privacy Act also includes. Ind. Code § 24-4.7-1-1(2).

These exceptions in no way approach the regulations invalidated in *Discovery Network* or *Pearson*, where the laws at stake had little hope of accomplishing their stated objectives. Indeed, Indiana's matrix of telephone privacy laws has proven highly effective, such that Hoosiers now guard their residential privacy jealously and refuse to accept unwanted, harassing telephone calls. Whatever else may be said about the Autodialer Law, it can hardly be tagged "ineffective."

**C. The Autodialer Law is Sufficiently Narrowly Tailored**

PVI argues that the Autodialer Law "acts as a complete ban on a form of traditionally protected political speech." (Pl. Mem. 11.) Setting aside PVI's questionable decision to characterize a means of speech less than 30 years old (*i.e.*, using autodialers to send pre-recorded messages) to be "traditional," the Autodialer Law allows PVI to send its pre-recorded, autodialed

messages so long as it receives consent from the recipient. PVI's real complaint is not that the Autodialer Law bans its harassing phone calls, but that it makes this harassment more expensive. (*See* Pl. Mem. 21-22.) The State's compelling interest in protecting residential privacy outweighs a speaker's interest in using cheap telephone calls to harass residents who have not consented to receiving such calls. *See, e.g., Nat'l Coal.*, 455 F.3d at 789-90.

1. To be sufficiently narrowly tailored, a content-neutral law regulating the time, place, or manner of speech need only have a "reasonable fit" with its objective. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) ("What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable.") (internal citations omitted). This does not mean *perfect* fit. *See id.* at 476-78. The law upheld in *Frisby* banned *all* protests directed at specific homes, even if the homeowner does not object in advance. *See Frisby*, 487 U.S. at 488. And while a criminal anti-solicitation law was struck down in *Martin* because it made no allowance for speech to willing residents, *Martin*, 319 U.S. at 144, the Indiana Autodialer Law permits autodialed, prerecorded calls to those who consent. *See* Ind. Code § 24-5-14-5(b)(1).

The Autodialer Law plainly bears a reasonable fit to its objective of preventing the incessant ringing of the telephone caused by autodialer technology, which, as PVI boasts, dials massive amounts of telephone numbers repeatedly in a short span of time. (Pl. Mem. 22; Pl. Ex. E, ¶¶ 8, 10.) The Indiana Autodialer Law prohibits only one method of communicating—using an autodialer to deliver prerecorded messages—and only when the call recipient has not given consent. *See* Ind. Code § 24-5-14-5(b). The Autodialer Law does not foreclose any alternative means of communication. PVI is free to deliver its message by countless other means, including live telephone calls, consented robocalls, radio and television advertising and interviews,

debates, door-to-door visits, mailings, flyers, posters, billboards, bumper stickers, e-mail, blogs, internet advertisements, Twitter® feeds, YouTube® videos, Facebook® postings, and more.

Courts have had no trouble concluding that similar laws prohibiting autodialers have been sufficiently narrowly tailored. *See Bland*, 88 F.3d at 735-36; *Van Bergen*, 59 F.3d at 1555-56; *Moser*, 46 F.3d at 974-75. This Court should do the same with regard to the Autodialer Law.

2. For its narrow tailoring argument, PVI principally relies on *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), as well as *Watchtower Bible and Tract Society v. Village of Stratton*, 536 U.S. 150 (2002), *Martin v. City of Struthers*, 319 U.S. 141 (1943), and *Schneider v. State (Town of Irvington)*, 308 U.S. 147 (1939). None of these cases has any relevance here. In *Ladue*, the Court invalidated a law precluding a means of communication *by* a homeowner rather than a means of communication *to* a homeowner without consent. *See Ladue*, 512 U.S. at 45. The only lesson to draw is that community aesthetics is an insufficient justification for prohibiting an individual from communicating a message on his own property. *See id*. at 54-55. Indeed, to the extent it exalts the primacy of individual homeowners when protected speech conflicts with community values, the rationale of *Ladue* supports upholding the Autodialer Law, which champions the rights of homeowners against the onslaught of robocalls.

In addition, the Court in *Ladue* focused on the “venerable” means of communication at issue, as “residential signs have long been an important and distinct medium of expression.” *Id*. at 55. The Court even cited cases protecting similarly “venerable” means of communication, including leafleting, door-to-door handbilling, and live entertainment. *See id*. (collecting cases). Automated, prerecorded messages, a technology still in its infancy in 1988 when Indiana enacted the Autodialer Law, does not similarly qualify as “venerable.” Even now, using the telephone to

spread automated, prerecorded political messages, while perhaps on the rise, hardly qualifies as a "common means of speaking." *See id*.

Even less applicable are *Jaynes v. Commonwealth*, 666 S.E.2d 303 (Va. 2008), and *Lysaght v. New Jersey*, 837 F. Supp. 646, 653 (D.N.J. 1993), which PVI claims extend *Ladue*. The *Jaynes* court confronted a Virginia statute criminalizing unsolicited commercial bulk e-mails in order to preserve the "efficiency and convenience of e-mail." *Jaynes*, 666 S.E.2d at 313. Because this statute addressed problems associated only with commercial e-mail, yet equally precluded non-commercial e-mail, it was not narrowly tailored. *Id.* This differs from the Autodialer Law, which is justified by reference to protecting residential privacy from *all* abusive uses of autodialers. Political robocalls are equally as disruptive of residential privacy as non-political calls, *see Van Bergen*, 59 F.3d at 1554-56, so the statute is not overbroad in relation to its justification.

Likewise, *Lysaght* confronted a statute targeting only *commercial* autodialing, and was invalidated as underinclusive because it insufficiently advanced New Jersey's interest in protecting residential privacy. *See Lysaght*, 837 F.Supp. at 651-52. It is thus unsurprising that *Lysaght* was ignored by *Van Bergen*, 59 F.3d at 1549-56, and *Bland*, 88 F.3d at 729, both of which also reviewed statutes prohibiting both commercial and non-commericial robocalls. The broadly-applicable Autodialer Law clearly advances the government's interest in protecting residential privacy, so *Lysaught* has no persuasive bearing here.[3]

*Martin* and *Watchtower Bible*—as well as *Town of Irvington*—are similarly distinguishable. Each of these cases protected a very common form of protected speech—handbilling door-to-door and on public streets by individuals—against questionable attempts to

[3] Curiously, PVI also cites *Moser v. Frohnmayer*, 845 P.2d 1284 (Or. 1993), a case explicitly declining to engage in First Amendment analysis of a robocall law—one that was content-based (because it was limited to commercial calls) in any event. *See id.* at 1288 n.4. *Frohnmayer* is irrelevant to this court's analysis.

protect against fraud and litter. *See Watchtower Bible*, 536 U.S. at 165-67; *Martin*, 319 U.S. at 143-44; *Town of Irvington*, 308 U.S. at 162-63. *Martin* and *Watchtower Bible* did not, for example, review laws prohibiting robots (or some other door-to-door equivalent of autodialers) from repeatedly knocking on the same doors to deliver prerecorded messages. Here, in contrast with the laws at issue in those cases, the Indiana Autodialer Law freely permits animate contact with Indiana residents in their homes to communicate political messages. The Autodialer Law even permits automated calls when the resident gives consent—an accommodation of individual preferences that the law in *Martin* did not make. *See* Ind. Code § 24-5-14-5(b)(1).

What is more, individual residences, unlike the public sidewalks and streets at issue in *Town of Irvington*, are not public fora. Citizens do not expect to be free from repeated entreaties in public; they do, however, expect it in their homes unless they have given consent. *See Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 736 (1970); *see also Hill v. Colorado*, 530 U.S. 703, 717 (2000) (upholding law requiring a targeted individual's consent before communicating any messages within 100 feet of an abortion clinic).

*Frisby*, which upheld a law prohibiting picketing directed at individual homes, neatly captures many of these concepts. It recognized that directing a protest at someone's house can be prohibited because "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Frisby*, 487 U.S. at 484 (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)). In fact, "a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions." *Frisby*, 487 U.S. at 484-85.

3. PVI's argument that it costs too much to hire live operators fares no better. (Pl. Mem. 21-22.) The Supreme Court has been quite clear that, where content-neutral laws are

concerned, the relative efficiency of the affected medium of communication is irrelevant. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 809 (1985) ("The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message."); *Taxpayers for Vincent*, 466 U.S. at 812 & n.30; *Kovacs*, 336 U.S. at 87-88.

The best that PVI can muster is to cite *Meyer*, where the Court invalidated a law prohibiting paid petition circulators in part because it outlawed the most efficient means of political speech. (Pl. Mem. 22 n.2 (citing *Meyer*, 486 U.S. at 422-24).) Again, however, the law at issue *directly targeted* political discourse. *See Meyer*, 486 U.S. at 420-21; *see also Nat'l Coal.*, 455 F.3d at 789-90; *Fraternal Order of Police*, 431 F.3d at 596-97. Laws that are content-neutral, on the other hand, may permissibly impose greater costs on speakers in order to limit the externalization of burdens. *See Nat'l Coal.*, 455 F.3d at 791 (upholding Indiana Telephone Privacy Act's requirement that charitable solicitations be made via volunteers and employees only); *Bland*, 88 F.3d at 736 (upholding autodialer law substantially similar to Indiana's); *Van Bergen*, 59 F.3d at 1556 (same); *Moser*, 46 F.3d at 973-75 (same).

PVI argues that "traditional forms of communication are either too slow . . . or impossible to obtain." (Pl. Mem. 22.) PVI goes on to explain that Metrotec lacks the capacity to meet the demand for its services without recourse to autodialing machines. (Pl. Mem. 22.) But the State is not required to refrain from regulating annoying and harassing telephone calls simply because a private corporation is unable or unwilling to meet the demand for its product. In short, there is no rule that political speakers must be able to use the most efficient channels of communication. Where, as here, the government has a subordinating justification for regulating a channel of communication, but other channels are available, the regulation is permissible. *See Van Bergen*,

59 F.3d at 1556 (holding that "[l]ive telephone calls, door-to-door distribution of information, street corner leafleting, posters and signs, and bulk mailings" were all adequate alternatives); *see also Frisby*, 487 U.S. at 486-87; *Moser*, 46 F.3d at 975.

*All* regulations of communication media impose costs and inefficiencies on speakers. But under PVI's theory, government could not regulate sound trucks, for example, if some speakers would thereby be economically unable to spread their messages. Since the Supreme Court has declared otherwise, *see Kovacs*, 336 U.S. at 87-89 (upholding prohibition against sound trucks), PVI's arguments must fail. PVI is in no better position simply because it has attempted to quantify the cost of compliance. The precise degree of efficiency over available alternatives has no bearing on the matter.

4. PVI also suggests two alternative regulatory approaches that, in its view, would sufficiently address the State's concerns. Neither fully comprehends, let alone addresses, the State's regulatory interest in protecting residential privacy from unwanted autodialer calls.

First, PVI touts its internal do-not-call list as an alternative source of residential privacy protection for Indiana residents. (Pl. Ex. D., ¶ 8.) PVI provides no evidence that it offers recipients the option of joining this list, that it discloses its identity to recipients, or would enable call recipients to register their preferences not to be called while on the phone. Indiana residents who receive a call from PVI may well have no idea whose no-call list they need to join in order to stop the calls from recurring, and the vast majority of call recipients would likely hang up long before obtaining all of the required information necessary to place themselves on such a list, even if forthcoming. Tellingly, the sample messages that PVI's vendor, Metrotec, posts on its web site do not disclose the source of the call or provide any opportunity for a call recipient to register an objection to receiving the call. (*See* Ex. 3, Attach. D.)

Furthermore, PVI provides no details concerning how it would enforce such consumer preferences, nor any data showing that registering for *its* internal no-call list would effectively preserve residential privacy from robocalls more generally. These omissions are significant because history has conclusively demonstrated that individual telemarketers' internal no-call lists provide ineffective protection for residential privacy. When the FCC first implemented the TCPA in the early 1990s, it created regulations requiring individual telemarketers to keep and adhere to internal lists of call recipients that registered their preferences not to be called again. *See* Telemarketing Sales Rule, Statement of Basis and Purpose, 68 Fed Reg. 4580, 4629-31 (Jan. 29, 2003). Consumers bore the heavy burden of communicating to *every* telemarketer that they be placed on these internal no-call lists. *See id.* at 4629. Such requests were often ignored and consumers lacked any means to monitor compliance. *See id.* Furthermore, resorting to the courts to protect these rights proved complex and time-consuming, and the resulting judgments were often difficult to enforce. *See id.* In 2003, the FCC rejected reliance on internal, company-based no-call lists as "seriously inadequate," noting that receiving even one unsolicited telemarketing call could make a consumer "angry and frustrated." *Id.* at 4630-31. In light of this history, the Tenth Circuit rejected the argument that company-specific no-call lists constitute an acceptable alternative to broader no-call rules. *See Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228, 1244 (10th Cir. 2004) (quoting the FTC do-not-call rule and finding that "the record in this matter overwhelmingly shows" that "the company-specific approach is seriously inadequate to protect consumers' privacy from an abusive patter of calls placed by a seller or telemarketer").

Second, PVI argues that "advances in technology" allow artificial intelligence systems to ask call recipients to consent to hearing the message and "respond accordingly." (Pl. Mem. 19-20.) PVI, however, provides no evidence that this technology exists and can function properly.

In the State's experience, supposedly interactive voice technology leads nowhere. A 527 organization named Economic Freedom Fund has attempted to use such technology, but the result was only frustration for the caller. (*See* Ex. 3, Attach. D.)

Moreover, PVI's proposed solution misunderstands the nature of the residential privacy problem. Because autodialed calls with recorded introductions are cheap and widely available, Jason C. Miller, *Regulating Robocalls: Are Automated Calls the Sound of, or a Threat to, Democracy?*, 16 Mich. Telecomm. Tech. L. Rev. 213, 214-16 (2009) (discussing the cheapness and availability of autodialed calls), they threaten a far greater number of privacy intrusions than calls introduced by live operators. The low cost of making pre-recorded robocalls is exactly what invites the evil that Indiana seeks to prevent, *i.e.*, multiple calls from a variety of sources disrupting the privacy of Indiana residences every day. The residential privacy costs from such calls are disproportionately high compared to the low cost incurred by the robocaller. The live-operator requirement aligns the costs voluntarily undertaken by the caller with the costs unilaterally imposed on the call recipient by forcing robocallers to internalize the privacy costs they impose on unwilling recipients. So, permitting robocallers to use automated response systems rather than live operators would allow robocallers to continue to externalize much of the cost of their calls and undermine the State's objective of protecting residential privacy.

Implicit in the narrow tailoring requirement is an acknowledgement that proposed more narrowly tailored alternatives are valid only insofar as they actually accomplish the interest effectuated by the government's chosen means. *See, e.g.*, *Lorrilard Tobacco Co v. Reilly*, 533 U.S. 525, 556 (2001) ("[T]he case law requires . . . 'a means narrowly tailored t*o achieve the desired objective*.'" (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (emphasis added)); *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000) ("If a less

restrictive alternative *would serve the Government's purpose*, the legislature must use that alternative.") (emphasis added). As automated response systems fail to effectuate Indiana's compelling interest, they are not a viable "more narrowly tailored alternative" for First Amendment purposes.

* * * *

The Indiana residential telephone privacy protection matrix has multiple levels, with political advocacy receiving the most caller-friendly treatment. The Autodialer law restricts all types of telemarketing, but unlike political advocacy calls, charitable and commercial solicitations are further restricted vis-à-vis Indiana residents who have joined the no-call list. This regulatory scheme allows political advocates many more avenues for communication under Indiana law than other speakers. The Seventh Circuit has already upheld the consumer opt-in regulatory model for charitable solicitations. *See National Coalition*, 455 F.3d at 792. Other circuits have upheld consumer opt-out laws precluding the use of robocalls, even where political callers are concerned. *See Van Bergen*, 59 F.3d at 1556.

Against this backdrop, there is no real dispute over the strength of the state's interest or the potency of the autodialer law. The only question is who should bear the initial burden: autodialer callers by being forced to receive consent, or citizens by being forced to register their desire to be left alone. S*ee* Telemarketing Sales Rule, Statement of Basis and Purpose, 68 Fed Reg. 4580, 4629-31 (Jan. 29, 2003) (discussing the burden of opt-in regimes on citizens). The Supreme Court has approved the opt-out model for political speech. In *Hill v. Colorado*, 530 U.S. 703, 717 (2000), it upheld a law imposing on protestors the burden of obtaining the consent of any patients they wished to talk to on sidewalks near abortion clinics. The protected audience—the patients—did not have to register their objection first. Rather, the burden was on

the speaker first to obtain consent. In the case of the Autodialer Law, an opt-out regulatory scheme gives effect to the desires of Indiana residents not to be bothered by this means of speech, while still respecting the super-minority's desire to receive such calls. It thus fits comfortably within the Supreme Court's First Amendment doctrine.

## II. The Autodialer Law Is Not Preempted By Federal Law

PVI's remaining argument is that the FCA, TCPA, and FCC regulations implementing these Acts, preempt the Indiana Autodialer Law as applied to interstate calls. However, this argument ignores principles governing the preemption of state law by federal law, the text of the Acts, the congressional intent behind them, and the proper standard of deference to agency determinations of the sort at issue. Thus, it must fail.

### A. The Federal Communications Act does not regulate interstate telephone harassment

There is a strong presumption that Congress does not intend to displace state law unless it does so clearly and unmistakably. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation omitted).

The underlying regulatory rationale of the FCA is to ensure a "rapid, efficient Nation-wide, and world-wide, wire, and radio communication *service* with adequate *facilities* at reasonable charges . . . ." 47 U.S.C. § 151 (emphasis added). The FCA applies to "all interstate . . . communication by wire," 47 U.S.C. § 152(a), but the term "communication by wire" is expressly defined to mean only "the *transmission* of writing, signs, signals, pictures, and sounds of all kinds by aid of wire . . . between the points of origin and reception of such transmission, including all *instrumentalities, facilities, apparatus, and services* (among other things the receipt,

forwarding and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(52) (emphasis added). Thus, the power to regulate interstate communication by wire is only the power to regulate interstate transmission, not the content of the communication, the conduct of the communicator, or the protection against injuries caused by harassing or fraudulent communications. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986) (discussing the dual system of state and federal regulation of telephone *service*); *see also City of New York v. FCC*, 486 U.S. 57, 65 (1988) (holding that the FCC has preempted state laws regarding *technical standards* for cable television signals).

Even the FCC has acknowledged that the FCA does not totally preempt state law. The FCC stated that "the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a de-tariffed environment. . . . [C]onsumers may have remedies *under state consumer protection and contract laws* as to issues regarding the legal relationship between the carrier and customer in a detarrifed regime." In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, 12 F.C.C.R. 15014, at 15057 ¶ 77 (Aug. 20, 1997) (emphasis added).

While federal law has historically regulated interstate telephone *services* and *facilities*, it has not regulated interstate telephone calls themselves—particularly those that harass or defraud the call recipient. Prohibiting telephone abuses, such as obscene or fraudulent calls, even if they cross state lines, has long been the terrain of the States. *See* Ind. Code § 35-45-2-2 (prohibiting harassment by obscene messages); Ind. Code § 24-5-0.5-1 *et seq*. (Indiana Deceptive Consumer Sales Act). The FCC has said that "states have a long history of regulating telemarketing practices." In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 F.C.C.R. 14014, at 14060 ¶ 75 (Jul. 3, 2003) (hereinafter, "2003 FCC

Report"). The history of state consumer protection enforcement bears this out. *See People ex rel. Spitzer v. Telehublink Corp.*, 756 N.Y.S.2d 285 (N.Y. App. Div. 2003); *Commonwealth v. Events Int'l, Inc.*, 585 A.2d 1146, 1148, 1151 (Pa. Commw. Ct. 1991); *cf. Sprint Corp. v. Evans*, 818 F. Supp. 1447, 1458 (M.D. Ala. 1993); *Ashley v. Southwestern Bell Tel. Co.*, 410 F. Supp. 1389, 1393 (W.D. Tex. 1976).

Moreover, the FCA's reservation of power over *intrastate* "communication by wire" to the states is limited to where those intrastate communications are "regulated by a State commission." 47 U.S.C. § 153(22). A "State commission" is not just *any* state agency, but one that "has regulatory jurisdiction with respect to intrastate operations of carriers." 47 U.S.C. § 153(41). A "carrier" is a "common carrier for hire, in interstate . . . communication by wire." 47 U.S.C. § 153(10). Thus, Congress ensured that *providers* of wire-communication services—not *users* of those services—are regulated by either the FCC or a state commission. Indeed, if "communication by wire" covered not only facilities and services but also injurious uses of the telephone, states would not even be able to regulate *intrastate* telephone harassment unless such was handled by a "state commission." 47 U.S.C. § 153(22).

Indiana's Autodialer Law regulates caller conduct, not communication service. It precludes the non-consensual dissemination of pre-recorded telephone calls via autodialers and does not interfere with Congress' goal of providing a rapid, efficient, reasonably priced national telecommunications service, even when applied to interstate calls. It does not regulate the provision of telephone services, the physical facilities of telephone services, or the price of telephone services. It merely protects residential privacy, a traditional concern of the States.

**B. Indiana's Autodialer Law does not conflict with the TCPA**

Indiana's Autodialer Law and the TCPA both prohibit making prerecorded calls with an autodialer without the call recipient's consent. *See* 47 U.S.C. § 227(a)(4); Ind. Code § 24-5-14-5(b)(1). The only difference is that the Indiana law, but not the federal law, applies to political-campaign calls. *See State of Indiana v. Amer. Family Voices, Inc.*, 898 N.E.2d 293 (Ind. 2008). PVI argues that this difference "frustrates" Congress' desire to have nationally uniform autodialer regulations. (Pl. Mem. 28.) PVI, however, has identified no statutory text—or legislative history—communicating Congress' intent to have a nationally uniform standard with respect to autodialer laws. *See Van Bergen*, 59 F.3d at 1548 ("[T]he preemption provision makes it clear that Congress did not intend . . . to promote national uniformity of ADAD regulation.").

PVI points only to TCPA legislative findings and history erroneously assuming that states were already precluded by the FCA from regulating interstate telemarketing calls. *See* S. Rep. No. 102-177, at 3 (1991); *see also id.* at 9 ("Federal action is necessary because States do not have the jurisdiction to protect their citizens against those who [place] interstate telephone calls."); 137 Cong. Rec. S16204, 16205 (1991) (statement of Sen. Hollings) ("State law does not, and cannot, regulate interstate calls."); 105 Stat. at 2394 ("Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation.").

For the reasons discussed at Part II.A, *supra*, these assumptions were incorrect then and are incorrect now. Indeed, the TCPA's finding that "telemarketers can evade [state] prohibtions through interstate operations," 105 Stat. at 2394, is at best ambiguous and likely refers to enforcement difficulties rather than preemption difficulties. Even if it mistakenly refers to

preemption, that mischaracterization does not *itself* create preemption—or a preference for nationally uniform regulation—not already extant.

In fact, Congress and other federal agencies have ensured that there is *not* a uniform national telemarketing policy. *See* 15 U.S.C. § 6102 (authorizing the FTC to create a different set of rules for telemarketing on behalf of charities); 16 C.F.R. § 310.7(b) (expressly *not* preempting state telemarketing laws with respect to charities); *see also* 47 U.S.C. § 227(e)(2) (expressly acknowledging that states will continue to "regulat[e] . . . telephone solicitations," after a federal do-not-call system is established); 47 U.S.C. § 227(c)(3)(J) (requiring that any FCC database "*shall* . . . be designed to enable States to use the [Commission's database] . . . *for purposes of administering* or *enforcing State law*") (emphasis added).

That the TCPA allows the FCC to strike a different, more telemarketer-friendly balance between residential privacy and telemarketing interests does not mean that Indiana's rule favoring privacy frustrates Congress' objectives. That is an entirely separate issue, and there is no evidence that Congress intended to achieve national uniformity when it comes to telemarketing regulation. Indeed, the record is to the contrary.

### C. The TCPA savings clause precludes any inference of preemption of state laws relating to interstate telemarketing

The TCPA has a "savings clause" precluding preemption of state laws such as the Indiana Autodialer Law. The TCPA savings clause provides:

> (e) Effect on State law
>
> (1) *State law not preempted*
>
> . . . **nothing** in this section or in the regulations prescribed under this section **shall preempt any State law** that imposes more restrictive intrastate requirements or regulations on, **or which prohibits**. . .
>
> **(B) the use of automatic dialing systems;**
>
> **(C) the use of artificial or prerecorded messages.**

47 U.S.C. § 227(e)(1) (emphasis added). This provision forecloses preemption with respect to *all* state prohibitions against using autodialers.

Terms or phrases separated by "or" have separate and independent significance. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979). Thus, as the TCPA is structured, express non-preemption applies to state laws that: (1) "impose[] more restrictive intrastate requirements . . . on" automatic dialing-announcing devices, *or* (2) "which prohibit" automatic dialing-announcing devices. 47 U.S.C. § 227(e)(1). The word "intrastate" modifies only the verb "imposes," which in turn refers only to "more restrictive . . . requirements or regulations on." *Id*. The word "intrastate" does not, however, modify the verb "prohibits." *Id*. By the plain, literal meaning of the statute, state laws "which prohibit" automatic dialing-announcing devices—whether interstate or intrastate—are not, and cannot be, preempted.

The FCC itself has acknowledged the validity of reading the TCPA savings clause in this manner. *See* 2003 FCC Report, at ¶ 60. Several courts have agreed. *See, e,g., Van Bergen*, 59 F.3d at 1548 ("[T]he [TCPA] includes a preemption provision expressly *not* preempting certain state laws.") (emphasis added); *State ex rel. Stenehjem v. FreeEats.com, Inc.*, 712 N.W.2d 828, 834-35 (N.D. 2006) ("[R]ead logically and grammatically, the [savings clause] states that nothing in the TCPA preempts . . . any state law 'which prohibits' calls within the enumerated list."); *see also Int'l Sci. & Tech. Inst., Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146, 1153 (4th Cir. 1997) ("Congress stated that state law is not preempted by the TCPA.").

Moreover, earlier, unenacted drafts of the TCPA would have preempted "any provisions of State law concerning interstate communications that are inconsistent with the interstate communications provisions of this section." 137 Cong. Rec. S16200, 16201 (1991). Congress ultimately decided against such broad preemption and went the opposite direction. Pre-

enactment deletion "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974); *accord Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) ("We ordinarily will not assume that Congress intended to enact statutory language that it has earlier discarded in favor of other language.") (internal quotations omitted). It would therefore be improper to infer congressional intent to preempt in this circumstance.

Finally, PVI's argument that the TCPA savings clause does not mean what it says depends entirely on its view that under the FCA states have no authority to regulate harassing interstate calls. Thus, PVI charges that the Attorney General's reading of the savings clause would render it a *grant* of authority. (Pl. Mem. 31.) The FCA, however, has never preempted states from outlawing interstate-telephone abuse or harassment of its citizens. *See* Part II.A., *supra*. The Court should, therefore, reject PVI's flawed FCA premise, and with it all of PVI's TCPA savings-clause arguments. (*See* Pl. Mem. 27-33.)

### D. There are no relevant FCC rules or adjudications warranting deference

PVI also argues that this Court should defer to the FCC's statement that "any state regulation of interstate telemarketing calls that differ from [FCC] rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted." 2003 FCC Report, at ¶ 84. For several reasons, the agency deference described in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984), does not apply here.

First, courts defer only to *authoritative* agency directives predicated on interpretations of the statutes they administer. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 586-88 (2000). With respect to preemption, the 2003 FCC Report ultimately says only that the Commission will "consider any alleged conflicts between state and federal requirements and the need for

preemption on a case-by-case basis." 2003 FCC Report, at ¶ 84. It invited "any party that believes a state law is inconsistent with section 227 or our rules [to] seek a declaratory ruling from the Commission." *Id*. This statement does not declare any state laws preempted, much less do so with authority. An agency's invitation to review issues on a case-by-case basis means that there is no general rule requiring deference. *See Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 811 (8th Cir. 1981).

At most, the statement is merely one of general policy. With a general policy statement, "[t]he agency retains the discretion and the authority to change its position—even abruptly—in any specific case because a change in its policy does not affect the legal norm." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *see also Iowa Power*, 647 F.2d at 811. General policy statements are not entitled to *Chevron* deference. *See Christensen*, 529 U.S. at 587. Moreover, agency decisions concerning the preemptive effect of congressional acts are not entitled to deference. *See Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 (1996) (refusing to defer to an agency regulation purporting to preempt state law, stating "[w]e may assume (without deciding) that [preemption] must always be decided *de novo* by the courts").

Finally, despite being asked to do so and receiving thousands of comments from citizens, states, and telemarketers in 2004 and 2005, the FCC has declined to take action preempting state telemarketing laws that are more stringent than the FCC's regulations. *See generally* FCC CG Docket No. 02-278. If congressional preemption were at all manifest, the FCC surely would have acted by now. There is no reason for the Court to rush in where the FCC fears to tread.

## III. PVI Is Not Entitled to Damages Under Any Circumstances

It is not clear whether PVI's motion for summary judgment pursues its claim for damages. Regardless, while the attorney general in his official capacity is subject to a claim for

injunctive relief under *Ex Parte Young*, both he and the State of Indiana are entitled to sovereign immunity from PVI's damages claim. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67 (1989). PVI has not sued the attorney general in his personal capacity, but if it had, the attorney general would also be entitled to qualified immunity since there is no clearly established right to use autodialers to send prerecorded messages. *See Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009); *cf. Van Bergen*, 59 F.3d at 1546. Finally, PVI has not set forth any facts substantiating a claim against the attorney general in his individual capacity and indeed the attorney general has not brought an enforcement action based on the complaint his office has received concerning PVI. For these reasons the defendants are entitled to judgment as a matter of law against PVI's damages claims.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that this court grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

GREGORY F. ZOELLER
Indiana Attorney General
Attorney No. 1958-98

By: *s/Thomas M. Fisher*
Thomas M. Fisher
Solicitor General
Attorney No. 17949-49
Office of the Attorney General
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204-2770
Phone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Paul L. Jefferson
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
Email: paul.jefferson@btlaw.com

I hereby certify that on November 19, 2010, I have mailed by United States Postal Service the foregoing to the following non CM/ECF participant:

Allison R. Hayward
Bradley A. Smith
Center for Competitive Politics
124 West Street South
Alexandria, VA 22314
Telephone: (703) 894-6800
Facsimile: 703.894.6811
Email: Ahayward@campaignfreedom.org

*s/Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South 5th Floor
302 W. Washington St.
Indianapolis, IN 46204-2770
Phone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov